In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-2839

GLENN CASSIMY,

*Plaintiff-Appellant,*

*v.*

BOARD OF EDUCATION OF THE ROCKFORD
PUBLIC SCHOOLS, DISTRICT #205,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Western Division.
No. 02 C 50097—**Philip G. Reinhard**, *Judge.*

ARGUED FEBRUARY 17, 2006—DECIDED SEPTEMBER 5, 2006

Before FLAUM, *Chief Judge*, and KANNE and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* Glenn Cassimy, a former administrator and teacher in the Rockford School District, alleges that the defendant Board of Education (Board) violated the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101 *et seq.*, when it both failed to accommodate his severe depression and retaliated against him by reclassifying him from "administrator" to "teacher." The district court granted summary judgment for the Board, finding that the undisputed facts showed that Cassimy was not disabled as the ADA uses that term, and that he had failed to present any evidence showing that the Board's explanation that it

had reassigned him because of its dissatisfaction with his performance was pretextual. We affirm.

**I**

In August of 1995, the Board hired Cassimy to be the principal of McIntosh Elementary School, in Rockford. In 1997, it transferred him to the Rockford Science and Technology Academy (RSTA), again to serve as principal. At both McIntosh and RSTA, Cassimy received positive performance reviews. In 2001, the Board transferred Cassimy to the post of principal at the Washington Communication Academy (Washington). Around the same time, the Board hired a new superintendent of schools, Alan Brown.

Cassimy's job duties at Washington included typical responsibilities such as staff development, curriculum development, and teacher evaluations. He was also required to supervise all staff members, implement a magnet theme, supervise student discipline, and supervise building operations. Cassimy found the Washington job difficult and stressful. Although he had received excellent evaluations before his transfer to Washington, once there the teachers complained about him both to his supervisor and to their union representatives. The Rockford Educational Association, which was the teachers' union, accused Cassimy of not being available to the staff. It also charged that discipline was out of control at the school and that he was not adequately addressing or processing student referrals. Parents were unhappy with the way he handled discipline. Other complaints reached Area Superintendent Sharon Halton about things like Cassimy's lack of availability, his failure to issue timely discipline, and his inability to prepare an adequate master schedule. During this time period, Cassimy alleged that he did not receive any administrative support from either his immediate supervisors or the Board. That lack of support, coupled with the problems he experi-

enced at Washington, caused him to suffer from stress and depression.

In light of all this, the Board eventually asked Cassimy to prepare a performance improvement plan to address his problems. Cassimy apparently prepared the plan, but before it could be implemented, he took a leave of absence beginning on November 21, 2000, claiming that he was suffering from work-related stress and anxiety and supporting his claim with a doctor's note. Cassimy sought treatment for his condition from Dr. Steven Mull, who prescribed Paxil and Xanax for his stress and depression. Shortly after his leave began, Cassimy talked on the telephone to Ann Anderson, the Assistant Superintendent for Human Resources. He told Anderson that it was impossible for him to function normally and that he was experiencing different levels of pressure on his brain. He could not read or write, he could not get up in the morning to get dressed, and he could not eat or sleep.

With this information in hand, the Board informed Cassimy on December 8 that it was designating his absence as medical leave under the Family and Medical Leave Act, effective November 21, 2000. Cassimy responded on December 15 with a note from his doctor releasing him to return to work. Anderson, Halton, and Brown met on December 18 to decide what to do with him; they concluded that they would reassign Cassimy from his administrative position and place him in a classroom as a math teacher at Roosevelt Alternative High School beginning in January 2001. This temporary move did not entail any loss of salary. The Board did not want to return him to Washington or put him in another administrative position because of the performance problems he had been experiencing prior to his leave.

The Board's plan ran into trouble when it learned that Cassimy did not have a current valid Illinois teaching certificate—a fact that it may have known as early as

December 18 (Cassimy's contention) or as late as February 2001 (the Board's version). This meant that Cassimy was not qualified to fill the vacant teaching position. Prior to the time the semester began, however, Cassimy had informed the Board that he could not return to work because of stress.

The Board then decided to create an assistant principal position for Cassimy at Auburn High School, where Cassimy would work on the development of the technology magnet theme of the school. Cassimy notified Anderson on March 20, 2001, that he intended to return to work by March 26 or 27, but that he would be restricted to working no more than six hours per day within the first month, and that he could not work on any special projects for the first two months. The Board concluded that these limitations were unreasonable, because it was a full-time position and because it did not see why he should be allowed "to pick and choose assignments." It formally denied his request on March 22.

On March 27, the Board informed Cassimy that it had officially approved the decision to reclassify him to the level of teacher, and that he therefore had to obtain a valid Illinois teaching certificate. Unlike the temporary move, the permanent reclassification carried with it a salary reduction. The Board explained that he, along with five other administrators, was being reclassified because of severe budget cuts. At first, Cassimy took steps to acquire the teaching certificate, but in August 2001, he told Anderson that he did not intend to apply for the certificate and that he was looking for work elsewhere. Before the start of the school year, Cassimy accepted a full-time position as an administrator with the New York City Public Schools effective September 2001, where he worked without any documented problems relating to stress, depression, or anxiety.

Before leaving for New York, Cassimy filed a complaint with the Illinois Department of Human Rights and the Equal Employment Opportunity Commission. His complaint alleged disability discrimination, failure to accommodate, and retaliation because of his request for an accommodation. After receiving a right-to-sue letter, he filed this lawsuit on March 10, 2003, claiming violations of Title VII, 42 U.S.C. §§ 2000e *et seq.*, the Civil Rights Act of 1991, 42 U.S.C. § 1981a, and the ADA, 42 U.S.C. §§ 12101 *et seq.* While the suit was pending, in February 2003, Cassimy returned to Illinois and accepted a teaching position with the Chicago Public Schools. He alleges that he now suffers panic attacks every Sunday while he is working on his lesson plans, which makes that process take longer than it otherwise would—sometimes up to 12 hours because of the frequent breaks he must take. The Board filed a motion for summary judgment on December 1, 2004, which the district court granted. This appeal followed.

## II

We consider first Cassimy's claims under the ADA, taking the facts in the light most favorable to him. The central question is whether the district court correctly concluded that Cassimy was not "disabled" for purposes of the statute. If that is correct, then neither his discrimination claim nor his failure to accommodate claim can proceed, as this is the first element of both claims. See *Nese v. Julian Nordic Constr. Co.*, 405 F.3d 638, 642-43 (7th Cir. 2005); see generally 42 U.S.C. § 12112(a) (discrimination); 42 U.S.C. § 12112(b)(5)(A) (accommodation); *McPhaul v. Bd. of Comm'rs of Madison County*, 226 F.3d 558, 563 (7th Cir. 2000) (accommodation). We thus turn immediately to that question.

In order to show that he was disabled, Cassimy must show either (1) that he has a "physical or mental impair-

ment that substantially limits [him in] one or more major life activities"; (2) that he "has a record of such an impairment"; or (3) that the employer "regarded [him] as having such an impairment." 42 U.S.C. § 12102(2)(A)-(C). In one way or the other, each of these theories focuses on "major life activities." The Supreme Court has defined "major life activities" to include those activities that "are of central importance to daily life," such as "walking, seeing, and hearing." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 197 (2002). This is a strict standard, as *Toyota* explicitly held. *Id.* Not every medical affliction amounts to, or gives rise to, a substantial limitation on a major life activity. See *Nese,* 405 F.3d at 642-43; *Christian v. St. Anthony Med. Ctr.,* 117 F.3d 1051, 1053 (7th Cir. 1997).

Like many illnesses, major depression may or may not give rise to a substantial limitation on a major life activity, depending on its severity. See *Ogborn v. United Food and Commercial Workers Union, Local No. 881,* 305 F.3d 763, 767 (7th Cir. 2002) (noting that major depression can be a disability under the ADA); *Schneiker v. Fortis Ins. Co.,* 200 F.3d 1055, 1061 (7th Cir. 2000) (holding major depression can be a disability, citing 29 C.F.R. § 1630.2(h)(2), which defines a physical or mental impairment to include "[a]ny mental or psychological disorder"). The critical question in every case is what was the effect of the impairment on the life of the individual. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483 (1999). We must therefore examine the evidence Cassimy produced to see if it gave rise to a genuine issue of fact on the question whether his mental condition substantially limited any major life activity.

Cassimy reported in his deposition that his depression and anxiety caused him to "collapse emotionally." He claimed that he could not eat or sleep, and that there was severe pressure on his brain. Later on (although we doubt the relevance of this for Rockford), he suffered

anxiety attacks on Sundays as he prepared his weekly lesson plans. The medical evidence, however, reveals that Cassimy never told his physician about either pressure on his brain or his inability to eat. More importantly, the evidence shows only that his condition impeded, but did not prevent, his ability to work. He himself said that it became more difficult for him to do his job at Washington because of the stress, anxiety, and depression.

To the extent that "working" is the major life activity under consideration, Cassimy must show that he had an inability to work in "a broad range of jobs, rather than a specific job." *Toyota,* 534 U.S. at 200 (internal quotation omitted). The district court concluded that Cassimy had not done so. To the contrary, the evidence showed that he functioned well in both teaching and administrative positions after he left his post as principal of Washington. The Sunday panic attacks may have slowed down his preparations for the upcoming week, but they did not prevent him from working. Indeed, he left the Rockford school system for other systems that must have been at least as demanding: the New York City Public Schools and the Chicago Public Schools.

This record also negates another critical point for Cassimy: whether the impairment from which he was suffering was permanent or long-term. *Toyota,* 534 U.S. at 196 (citing 29 C.F.R. §§ 1630.2(j)(2)(i)-(iii) (2001)). Isolated bouts of depression, we have recognized, do not qualify as disabilities under the ADA. *Ogborn,* 305 F.3d at 767. The district court found that the undisputed evidence showed that Cassimy's problems with stress and anxiety rendered him unable to work as the principal of Washington, but that he "was and is" able to work as an administrator and teacher elsewhere. Cassimy takes issue with this finding, claiming that the record (construed favorably to him) supports the conclusion that his depression began in 2000 and continued for at least two years thereafter.

The objective facts do not bear out Cassimy's assessment of his situation. They show that on November 21, 2000, Cassimy took a leave of absence because of his stress and anxiety and presented a doctor's note asking that the Board excuse him for a period of two weeks. Three weeks later, he returned to work. Some time in January 2001, Dr. Mull diagnosed him with depression and he took another leave. On March 20, 2001, he received a doctor's note indicating that he should be allowed to return to work on March 27 with a decreased workload and no additional projects, but around March 26, he was released to return to work with no restrictions. The note said "[p]lease allow to RTW [return to work] 3/28/01. [Cassimy] is presently controlled in his illness with medication at the present time." After conducting a physical examination in May 2001, Cassimy's doctor indicated that his anxiety and depression were "primarily situational" and that Cassimy would need to continue taking Paxil and Xanax only for another four to six months. By that time, he was working in New York full time, from 7:30 a.m. to 5:00 p.m. every day, often taking work home with him for the evenings. The record also indicates that he has not sought treatment or taken any medication for this condition since late 2002, and that in the fall of 2003 he missed only about three days of work for stress and depression.

Cassimy argues in the alternative that the Board regarded him as disabled, but the record is equally barren of facts that would support this claim. Under a "regarded as" theory, the plaintiff must prove either that (1) the employer mistakenly believes that the employee has an impairment that substantially limits a major life activity, or (2) the employer mistakenly believes that an existing impairment that is not really limiting does substantially limit a major life activity. *Nese,* 405 F.3d at 641. Awareness of the condition, however, is not the same thing as a belief that the condition is substantially impairing. See *Krocka v. City*

*of Chicago,* 203 F.3d 507, 514 (7th Cir. 2000). Here, the record shows that Cassimy told members of the Board that he was being treated for depression and anxiety, and that the Board received medical records indicating that he was being treated for these conditions. What it does not show, however, was that the Board "held exaggerated views about the seriousness of his illness." *Ogborn,* 305 F.3d at 768. To the contrary, Brown testified that he was aware that Cassimy suffered from depression and anxiety and had sought medical help for this problem, but that "at no time was the doctor characterizing Mr. Cassimy as disabled, only that there was an illness."

We conclude, in light of all this, that the facts in the light most favorable to Cassimy do not show that he either had a disability for ADA purposes, or that the Board regarded him as having a disability. This finding is enough to support the district court's decision to grant summary judgment in the Board's favor on both the discrimination claim and the failure-to-accommodate claim.

### III

We conclude with a word about Cassimy's retaliation claim. Even if he was not disabled, it would still violate the statute if the Board had retaliated against him for attempting to raise a good-faith claim under the ADA. There is enough evidence in the record of Cassimy's depression to support the good-faith nature of his claim. The question on the merits is whether he introduced enough evidence that a reasonable trier of fact could find that the Board retaliated against him.

Because Cassimy has no direct evidence of retaliation, he must proceed under the indirect method of proof. In a case brought under the Rehabilitation Act of 1973, which we have held to be equivalent to the ADA for these pur-

poses, we summarized the requirements of a retaliation claim as follows:

> [The plaintiff] must first establish a *prima facie* case of retaliation by demonstrating that after engaging in protected activity such as filing a charge, she was subjected to an adverse employment action even though she was performing her job satisfactorily, and no similarly situated employee who did not file a charge was subjected to the adverse employment action. *Hudson v. Chicago Transit Auth.,* 375 F.3d 552, 559 (7th Cir. 2004) [Title VII]. The burden then shifts to the employer to present evidence of a non-invidious reason for the employment action at issue. *Id.* If the employer does so, the burden shifts back to the employee to demonstrate that the employer's proffered reason is pretextual. *Id.*

*Mannie v. Potter,* 394 F.3d 977, 984 (7th Cir. 2005). In Cassimy's case, everyone agrees that he engaged in statutorily protected expression when he requested an accommodation. Similarly, while his initial reassignment may not have been an adverse action, his later reclassification to the post of teacher was, since that action resulted in a decrease in his salary. See *Crady v. Liberty Nat'l Bank & Trust Co. of Ind.,* 993 F.2d 132, 136 (7th Cir. 1993). (The fact that the anti-retaliation provisions of these laws cover more than "adverse employment actions" does not mean, of course, that an adverse employment action may not be retaliatory. See *Burlington Northern & Santa Fe Ry. Co. v. White,* 126 S.Ct. 2405, 2412-13 (2006).)

The question is therefore whether Cassimy identified any similarly situated employee who did not file a charge and who received better treatment than he. Cassimy claims that the Board was willing to accommodate Leonard Guenzler, a cancer patient who was in treatment while serving as principal at Jefferson School in Rockford: Guenzler was

allowed to work less than a six-hour work day, and other administrators filled in to help Guenzler complete his duties. Guenzler's illness, however, was demonstrably more severe than Cassimy's; indeed, Guenzler died of the cancer some time later. He was therefore not similarly situated to Cassimy.

Other than that, Cassimy points only to the temporal proximity of the Board's action in re-classifying him, which occurred soon after he requested his accommodations. We have often noted that "suspicious timing alone rarely is sufficient to create a triable issue." *Moser v. Ind. Dept. of Corr.,* 406 F.3d 895, 905 (7th Cir. 2005); see also *Stone v. City of Indianapolis Pub. Utils. Div.,* 281 F.3d 640, 644 (7th Cir. 2002). Even if we thought that the timing here was close enough to support an inference of retaliation, we are satisfied that there is nothing in the record to undermine the Board's stated reason for its action: that budget cuts necessitated reclassification not only of Cassimy, but also of five other administrators, who as far as this record shows had never complained about anything. The Board explained the timing of its action by pointing to the fact that the Illinois School Code requires reclassification decisions to be made by April 1, which is why it acted in Cassimy's case at the end of March.

Cassimy is unable to show that only he, among a group of otherwise similarly situated employees, was treated adversely by the Board; he has no other direct or circumstantial evidence of retaliation; and he offers no evidence that would support a finding that the Board's stated reasons were pretextual. The district court therefore correctly granted summary judgment for the Board on the retaliation claim also.

The judgment of the district court is AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*